**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

STEPHANIE F.,[1]

|  |  |  |
|---|---|---|
|  | Plaintiff, | 8:20-cv-1528 (BKS) |

v.

KILOLO KIJAKAZI, Acting Commissioner of Social
Security,

|  |  |
|---|---|
|  | Defendant. |

**Appearances:**

*For Plaintiff:*
Justin Goldstein
Law Offices of Kenneth Hiller
6000 North Bailey Avenue, Suite 1A
Amherst, NY 14226

*For Defendant:*
Carla B. Freedman
United States Attorney
Timothy S. Bolen
Special Assistant United States Attorney
Social Security Administration
J.F.K. Federal Building, Room 625
Boston, MA 02203

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Stephanie F. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties'

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 17, 18). After carefully reviewing the Administrative Record,[2] and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for SSDI benefits on November 21, 2018, alleging disability due to a variety of physical impairments with an alleged onset date of June 26, 2018. (R. 166–69, 195). Plaintiff's claim was denied initially on March 11, 2019 and again upon reconsideration on July 18, 2019. (R. 56, 82). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge ("ALJ") David Romeo on March 4, 2020, at which Plaintiff was represented by non-attorney representative Matthew F. Nutting. (R. 28–55). On March 26, 2020, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 13–21). Plaintiff filed a request for review of that decision with the Appeals Council, which denied review on November 10, 2020. (R. 1–6). Plaintiff commenced this action on December 10, 2020. (Dkt. No. 1).

### B.    Plaintiff's Background and Hearing Testimony[3]

Plaintiff was born in 1971 and was 46 years old at the alleged onset of her disability and 48 years old at the time of the ALJ's decision. (R. 33). At the March 4, 2020 hearing, Plaintiff testified that she completed high school and had past work as a food service worker. (R. 35). Plaintiff testified that she stopped working on June 26, 2018 due to "a lot of pain in [her] hip."

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 13), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

[3] The Court does not address the record evidence regarding Plaintiff's anxiety, as Plaintiff does not dispute the ALJ's findings regarding that impairment.

(R. 36). She has "an awful time sitting and standing for any length of time" due to pain in her spine, hip, and knee after having a right hip replacement. (R. 36–37). Plaintiff has difficulty and pain with getting in and out of vehicles and getting dressed. (R. 37). She testified that at times she has to "lay down just to ease the pain," that over-the-counter pain medications are not effective, and that she cannot tolerate physical therapy. (R. 39).

Plaintiff lives in an apartment with her son, and her children help her with laundry and other household chores. (R. 40). Plaintiff sleeps on the first floor and only goes up to the second floor to take a shower. (*Id.*). When grocery shopping, Plaintiff always has someone with her, and she uses a cart to lean on. (R. 41). Plaintiff generally testified that her hip pain got worse after her hip replacement surgery. (R. 48–51).

### C.   Medical Evidence

#### 1.   June 2018 through January 2019

##### a.   June 2018 X-Rays

Plaintiff had X-rays taken of her hips in June 2018. (R. 682). The imaging showed "very mild osteoarthritis of the right hip" with "a very slight marginal spur and a limp on the acetabulum with good joint space present." (*Id.*). There were no "cystic changes" or deformity." (*Id.*). Plaintiff complained of a "burning sensation" in her hip and groin pain while standing. (*Id.*). She demonstrated a "fairly good range of motion of her hip." (*Id.*).

##### b.   Claxton-Hepburn Medical Center Primary Care

Plaintiff treated with Hillary Heaton, FNP-C at Claxton-Hepburn Medical Center ("Claxton-Hepburn"). (R. 482). On June 27, 2018, Plaintiff presented with increased pain in both of her hips, especially on the right side. (R. 482–83). Nurse Heaton recommended that Plaintiff start physical therapy, lose weight, and follow up with an orthopedic surgeon, and she made a referral to pain management. (*Id.*). Nurse Heaton noted on examination that Plaintiff had painful

abduction of the right hip and tenderness in both hips, although there was no erythema or

swelling appreciated in the joints. (R. 483). At follow-up appointments in July and August 2018,

Nurse Heaton again noted Plaintiff's hip pain and recorded similar examination results. (R. 475–

81). Treatment notes from September and October record the same examination results relating

to Plaintiff's hip and record her appointments with other providers for hip injections and to

discuss the possibility of a hip replacement. (R. 468–73).

### c.     Claxton-Hepburn Physical Therapy

Plaintiff was evaluated on July 5, 2018 at the Claxton-Hepburn rehab services

department. (R. 334). Plaintiff was noted to have chronic hip pain which was worsening. (R.

335). She displayed "moderate to major loss of all hip Active range of motion/Passive range of

motion with pain during movement," and her prognosis was "fair." (*Id.*). After a few

appointments, Plaintiff was discharged to a home exercise program in August. (R. 349). Plaintiff

was evaluated at Claxton-Hepburn again on December 19, 2018. (R. 357–59). Plaintiff was

assessed with "chronic right hip pain, which [wa]s worsening." (R. 359). She displayed moderate

loss of active range of motion of her right hip and decreased hip strength, and she was limited in

sitting, sleep, walking, stairs, and squatting. (*Id.*).

### d.     Syracuse Orthopedic Specialists

On August 8, 2018, Plaintiff saw Seth Greenky, MD at Syracuse Orthopedic Specialists

("SOS") for a second opinion on her hip. (R. 558–60). At the time, Plaintiff was in physical

therapy and ambulated without an assistive device, although "she walk[ed] like she is about 80."

(R. 559). Her "sensory and motor" were intact. (*Id.*). Plaintiff's left hip had a greater range of

motion and was less painful than her right hip, which was able to flex to 90 degrees, extend to +5

degrees, and rotate internally and externally to 5 degrees with pain. (*Id.*). Dr. Greenky reviewed

X-rays of Plaintiff's hips, which showed "significant osteoarthritis of both hips" and "[v]ery,

very, small joint space." (*Id.*). Overall, Dr. Greenky assessed Plaintiff with "significant primary osteoarthritis of both hips," although the right hip was clinically worse than the left. (R. 560). He noted that Plaintiff would "probably end up getting a hip replacement" but that she needed to quit smoking and lose weight first. (*Id.*).

On September 12, 2018, Dr. Greenky noted that Plaintiff had "lateral hip, groin, and thigh pain, worse with activity." (R. 556). Her sensory and motor were intact, although both hips were stiff and her right hip had limited range of motion and rotation. (*Id.*). Dr. Greenky stated that Plaintiff's osteoarthritis "clearly limit[ed] her ability to be on her feet for a long period of time." (*Id.*). He recommended trying a hip injection to relieve her pain and considered Plaintiff to be "75% disabled." (*Id.*). Plaintiff received a hip steroid injection on September 28, 2018. (R. 572–73).

Dr. Greenky noted at a visit on November 20, 2018 that Plaintiff ambulated with a limp and had stiff hips. (R. 553). Although the hip injection Plaintiff received at the end of September helped "for 3 or 4 days," her symptoms returned and she had difficulty doing "sustained walking, stairs, and walking on uneven surfaces." (*Id.*). Dr. Greenky scheduled Plaintiff for right total hip replacement surgery. (*Id.*). Dr. Greenky saw Plaintiff once more before the surgery, noting that Plaintiff had "bone-on-bone arthritis of her hip" leading to "significant issues," and that she ambulated "with a gimpiness." (R. 551).

### e.       Total Hip Replacement Surgery

On January 24, 2019, Dr. Greenky performed a total right hip replacement on Plaintiff without any complications. (R. 295–98). X-rays taken immediately after the surgery showed "[s]atisfactory alignment and position" of the hip and "no evidence of fracture or dislocation." (R. 303–08).

### 2.     Post-Surgery Evidence

#### a.     SOS Records

On February 7, 2019, two weeks after her surgery, Plaintiff followed up with Dr. Greenky. (R. 364–67). Plaintiff was "doing well" and "using a walker." (R. 366). On March 15, Plaintiff was "using a cane to get around" with "somewhat of a limp" and complaining of "anterior thigh pain." (R. 544). On examination, Plaintiff demonstrated adequate passive range of motion of her hip and "intact" sensory and motor. (*Id.*). She was able to do a "straight leg raise with good strength." (*Id.*). Dr. Greenky recommended that Plaintiff stop outpatient physical therapy and reevaluate in one month. (*Id.*).

Plaintiff followed up with Dr. Greenky on April 10, 2019, almost three months after her surgery. (R. 541). She reported "constant moderate severe pain" in her anterior thigh which could not be alleviated. (*Id.*). Plaintiff had 110 degrees of flexion, 25 degrees of internal rotation, and 25 degrees of external rotation in the right hip, with pain. (R. 542). Dr. Greenky ordered X-rays of her hip and found "no problems with the replacement." (*Id.*). He thought Plaintiff's pain was "a muscular problem more than [a] replacement problem." (*Id.*). Dr. Greenky opined that Plaintiff would benefit from physical therapy but would continue to be out of work. (*Id.*).

On April 23, 2019, Dr. Greenky ordered additional testing and imaging, and recommended that Plaintiff "go back on the cane temporarily to take some weight off" and do physical therapy. (R. 539). The imaging revealed "a tiny bit of reactive bone at the tip of prosthesis" but was otherwise normal. (R. 535; *see also* 562). Dr. Greenky noted that Plaintiff had to "play this out a little bit and wait for improvement. (R. 535). Plaintiff saw Dr. Stephen Bogosian, also at SOS, for a second opinion on May 29, 2019. (R. 530–33). Dr. Bogosian reviewed Plaintiff's X-rays and noted that there was "slight medial perforation of an acetabular screw," although the overall alignment of the hip implant was "excellent." (R. 532). He

recommended that Plaintiff do some stretching and minimal walking, and Plaintiff requested a prescription for a walker so she could acquire temporary disability. (*Id.*).

Plaintiff saw Dr. Greenky again on July 9, 2019. (R. 709). She reported that she had "a moderate level of pain that exist[ed] all the time," and she was using a walker. (R. 711). Dr. Greenky noted that Plaintiff's "leg lengths [were] the same," that she could flex and extend her hip, and that she had intact passive range of motion of her hip but with pain throughout which was aggravated by resisted hip flexion. (*Id.*). A straight leg raise was "particularly difficult," and her sensory and motor were intact. (*Id.*). Dr. Greenky recommended an aspiration of her hip to determine whether there was an infection. (*Id.*). The aspiration did not "show any increased white cells and did not grow anything." (R. 707). In October 2019, Dr. Greenky recommended a "three-phase bone scan to rule out loosening of the femoral component" and an MRI of Plaintiff's lumbar spine to rule out any spinal issues. (*Id.*). Dr. Greenky opined that Plaintiff's prognosis for working was "very guarded." (*Id.*).

### b.    Claxton-Hepburn Records

On March 7, 2019, Nurse Heaton saw Plaintiff for a follow-up after her hip replacement surgery. (R. 462–63). Plaintiff reported that she was "still having a lot of pain and discomfort and [wa]s unable to sleep." (R. 463). On examination, Plaintiff demonstrated painful abduction of the right hip and had tenderness in both hips. (R. 464). Nurse Heaton noted no erythema or swelling in the joints. (*Id.*). On April 18, 2019, Plaintiff reported to Nurse Heaton that she was in "a lot of pain," particularly in the right thigh and right groin, and that she felt "frustrated." (R. 458–60). Nurse Heaton noted the same physical examination results as in March. (R. 461). Treatment notes between June 2019 and January 2020 continue to note that Plaintiff complained of hip and thigh pain and presented with tenderness and painful abduction of the right hip. (R. 588, 662–80).

c.      **Physical Therapy**

Plaintiff reported to Claxon-Hepburn for physical therapy on February 5, 2019. (R. 318). She reported that her hip surgery went well. (*Id.*). She displayed moderate loss of right hip active range of motion and strength and ambulated with a rolling walker. (R. 320). On April 30, 2019, Plaintiff presented with tenderness over the right hip, anterior and lateral thigh, and groin. (R. 631). It was noted that "[a]ny hip movement appears to be painful," and that if Plaintiff was unable to tolerate land-based therapy, she would be referred to aquatic therapy. (R. 632–33).

d.      **Emergency Room Visits**

On April 4, 2019, Plaintiff presented to the Claxton-Hepburn emergency room complaining of pain in her right hip. (R. 393). Plaintiff rated her pain as a 10 out of 10 and demonstrated limited range of motion in the right hip, although her circulation, motion, and sensation were intact. (*Id.*). Plaintiff was able to ambulate with assistance (R. 395). Plaintiff returned to the emergency room on April 13, again complaining of persistent hip pain. (R. 403). She appeared "uncomfortable" and rated her pain as a 10 out of 10. (*Id.*). Plaintiff described "burning" pain in her right anterior thigh and reported that over-the-counter medicine did not help. (R. 405). The provider noted tenderness over the proximal anterior thigh and stated that the motor exam was "limited by pain but appear[ed] grossly intact." (R. 406).

On April 29, 2019, Plaintiff reported to the emergency room with right hip pain that was "worse than usual." (R. 412). Plaintiff was able to ambulate with "mild difficulty." (R. 414). On examination, Plaintiff demonstrated limited active and passive range of motion due to pain in the right quadriceps. (R. 415). Her circulation and sensation were intact. (*Id.*).

Plaintiff presented at the emergency room again on September 24, 2019, complaining of hip pain and being unable to walk. (R. 616). Plaintiff had full motor strength in her extremities and limited range of motion in her hip. (R. 619). The right hip displayed "limited range of

motion, painful range of motion, [and] tenderness." (*Id.*). Imaging of Plaintiff's hip showed that the prothesis was "in place," but that the "medial screw ha[d] penetrated the right iliopectineal line with injury to the right lateral pelvic wall" and the "acetabular cup protrude[d] beyond the iliopectineal line at its medial aspect." (R. 621).

### e.    University of Vermont Medical Center

Plaintiff was seen by Dr. Michael Blankstein of the University of Vermont Medical Center on September 18, 2019 for another opinion on her hip pain. (R. 694–98). Plaintiff reported that her pain was located in the groin, thigh, and lower back, and that she had trouble standing, sitting, and getting in and out of cars. (R. 697). Plaintiff ambulated with a mild limp. (*Id.*). She had intact sensation and strength in both of her legs, and her right leg was shorter than her left by 0.5 centimeters. (*Id.*). On examination, Plaintiff had "4/5 right hip flexion," thigh discomfort with hip range of motion, flexion to 95 degrees, external rotation of 40 degrees, and internal rotation of 10 degrees. (R. 698). Dr. Blankstein ordered and reviewed imaging, which showed "well-aligned acetabular and femoral components" in the right hip with no sign of loosening or wear. (*Id.*). He noted that "it is not clear why [Plaintiff] is having pain" and that her gait was "not particularly off." (*Id.*). Dr. Blankstein recommended that Plaintiff "work at losing some weight and [] begin PT to help with her pain." (*Id.*).

### D.    Opinion Evidence

#### 1.    State Agency Medical Consultants

On March 8, 2019, non-examining state agency medical consultant Dr. J. Sharif-Najafi opined that Plaintiff had the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of six hours in an eight-hour workday; and sit with normal breaks for a total of six hours in an eight-hour workday. (R. 64–

65). Dr. T. Schmidt-DeYoung opined the same limitations on reconsideration of Plaintiff's application on July 11, 2019. (R. 77–79).

### 2. Dr. Elke Lorensen (Consultative Examiner)

Elke Lorensen, M.D. conducted an internal medicine examination of Plaintiff on March 5, 2019. (R. 378–82). Plaintiff arrived at the examination with a cane, which she "uses all the time since she had the surgery," and she complained of "trouble walking and pain in her right hip." (R. 378). Plaintiff reported that she showered and dressed daily but was unable to cook, clean, do laundry, or shop. (*Id.*). Dr. Lorensen noted that Plaintiff appeared to be in no acute distress but had an abnormal gait with a moderate favoring of the left leg. (R. 379). Plaintiff declined to walk on her heels and toes or squat. (*Id.*). Dr. Lorensen opined that the cane was "medically necessary at the current time" and noted that, without the cane, there is "moderate favoring of the left leg." (*Id.*). Plaintiff was able to get on and off the exam table without the cane "but with a lot of difficulty." (*Id.*). She was able to rise from a chair with difficulty without using the cane. (*Id.*). Plaintiff demonstrated right hip flexion of 70 degrees and left hip flexion of 90 degrees, and she had a negative straight leg raise test. (R. 380).

Overall, Dr. Lorensen opined that Plaintiff had moderate limitations for "standing and ambulating, bending, lifting, and reaching[,] presumably secondary to recent right total hip replacement surgery," and moderate to marked limitations for squatting. (R. 381).

### 3. DPT Trevor Johnson (Physical Therapist)

On January 28, 2020, Trevor Johnson, PT, DPT performed a functional capacity evaluation of Plaintiff and completed a medical source statement of her ability to do work-related activities. (R. 718–60). The evaluation lasted two hours and forty-five minutes and resulted in a thirty-seven-page report. (R. 718–54). DPT Johnson's report states that Plaintiff's "maximum functional capacities" include: occasionally lift 20 pounds, bilateral 40-foot carry of 20 pounds,

and walking for 6 minutes and 38 seconds on the treadmill. (R. 721). DPT Johnson noted that Plaintiff was cooperative and willing throughout the evaluation but was "limited in quality by her pain." (R. 722). Her reports of pain were consistent. (*Id.*).

DPT Johnson found that, while Plaintiff transitioned between sitting and standing throughout the evaluation, she demonstrated the ability to sit for 25 minutes; stand for 10 minutes; and intermittently stand, sit, and walk for 130 minutes. (R. 722–23). Plaintiff arrived at the evaluation "ambulating with a straight cane, with antalgic gait pattern due to decreased stance time [right lower extremity ("RLE")], decreased hip flexion/extension RLE, and poor weight resistance on RLE due to pain." (R. 723). She ambulated 500 feet twice, to enter and exit the facility. (*Id.*). Plaintiff appeared uncomfortable during the intake process, which required continuous sitting for 25 minutes, and was observed "guarding, bracing, grimacing, static weight shifting, moaning/groaning, rubbing and/or massaging." (R. 724). She also appeared uncomfortable during the physical evaluation. (*Id.*). DPT Johnson's report sets forth in detail the tests he administered and Plaintiff's performance on them. (R. 723–52).

In the medical source statement, DPT Johnson opined that Plaintiff could occasionally lift and carry up to 20 pounds. (R. 755). He noted that Plaintiff arrived at the evaluation using a straight cane, but that she was "able to complete lifting/carrying without [the] device." (*Id.*). He further opined that Plaintiff could sit for 25 minutes, stand 10 minutes, and walk for 6 minutes at a time, and that she could sit for a total of 2 hours, stand for 1 hour, and walk for 1 hour in an eight-hour workday. (R. 756). He explained that Plaintiff "will likely need time to lay down during [the] day due to pain." (*Id.*). Although Plaintiff used a cane to ambulate, DPT Johnson opined that the cane was not medically necessary, noting that Plaintiff had recently suffered a fall. (*Id.*). DPT Johnson also opined that Plaintiff could not "perform activities like shopping" or

11

"walk a block at a reasonable pace on rough or uneven surfaces." (R. 760). DPT Johnson's opinion expressly references his functional capacity evaluation report and notes that "[a]ll decisions should take into account [Plaintiff's] treating medical provider history." (*Id.*).

### E.    The ALJ's Decision Denying Benefits

ALJ Romeo issued a decision dated March 26, 2020 and determined that Plaintiff was not disabled under the Social Security Act. (R. 13–21). After finding, as an initial matter, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023, (R. 15), the ALJ used the required five-step evaluation process to reach his conclusion.[4]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date of June 26, 2018. (*Id.*). At step two, the ALJ determined that Plaintiff had the following severe impairments: "right hip osteoarthritis status-post total right hip replacement, and obesity." (*Id.* (citing 20 C.F.R. § 404.1520(c))).[5] The ALJ noted references in the record to hypertension, tobacco dependence, lower extremity edema, mild osteoarthritis of the left hip, and anxiety but found that these impairments were not severe. (R. 15–17). The ALJ also found that Plaintiff's complaint of "bilateral knee pain" was not medically determinable. (R. 17).

---

[4] Under the five-step analysis for evaluating disability claims:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[5] Plaintiff does not challenge the ALJ's findings at steps one and two.

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)). The ALJ found that the criteria for Listing 1.02—dysfunction of a major weight-bearing joint due to any cause—were not met because "there is well maintained hip joint, sensory intact, and normal muscle strength." (*Id.*).

The ALJ then proceeded to determine Plaintiff's residual functional capacity ("RFC")[6] and found that Plaintiff had the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except no operation of foot controls with the right lower extremity, no kneeling, or crawling, occasional balance, stoop, or crouch; would need an option to stand for five minutes after every 20 minutes of sitting; can remain on task while standing; and would require a cane to walk but not for balance while standing.

(R. 18). In making this determination, the ALJ followed a two-step process by which he first determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (*Id.*). Applying this two-step process, the ALJ found that while the "claimant's medically impairments could reasonably be expected to cause the alleged symptoms," "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 19). In coming to this determination, the ALJ considered the medical opinions in the record from Drs.

---

[6] The regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1).

Sharif-Najafi and Schmidt-DeYoung, Dr. Lorensen, and DPT Johnson. (R. 19–20). The ALJ found the opinions of Drs. Sharif-Najafi and Schmidt-DeYoung "somewhat persuasive" but that they "overestimate[] exertional and ambulatory capacity." (R. 19). Similarly, the ALJ found Dr. Lorensen's opinion "somewhat persuasive" but also that it overestimates Plaintiff's abilities. (*Id.*). The ALJ therefore adopted "greater limitations" in the RFC to account for "ongoing use of a cane for ambulation and complaints of pain." (*Id.*). The ALJ then found DPT Johnson's opinion "not persuasive" because "a physical therapist is not an acceptable medical source, and the conclusions are not consistent with the overall medical evidence reflecting less severe restrictions." (R. 19–20).

At step four, the ALJ determined that Plaintiff was "unable to perform any past relevant work." (R. 20). At step five, relying on the testimony of the vocational expert, the ALJ found that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (*Id.*). These occupations include order clerk, ticket checker, and credit clerk. (R. 21). Accordingly, the ALJ found Plaintiff "not disabled." (*Id.*).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir.

2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

### B.     Analysis

Plaintiff argues that: (1) the ALJ's step three finding is unsupported by substantial evidence; (2) the ALJ failed to properly weigh the opinions of Dr. Greenky and DPT Johnson; and (3) the ALJ's RFC determination is otherwise unsupported by substantial evidence. (Dkt. No. 17, at 12–25).

### 1.     Step-Three Finding

Plaintiff first argues that the ALJ's finding at step three that Plaintiff's right hip impairment does not meet or medically equal a listed impairment is unsupported by substantial evidence, arguing that the ALJ "failed to explain how the medical evidence does not satisfy the requirements of both Listings 1.02 and 1.03." (Dkt. No. 17, at 12–17). Defendant responds that substantial evidence supports the ALJ's step-three finding and that Plaintiff cannot demonstrate

that her impairment results in an "inability to ambulate effectively," as required by Listings

1.02A and 1.03. (Dkt. No. 18, at 5–10).

Listing 1.02A, major dysfunction of a joint, is "[c]haracterized by gross anatomical

deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint

pain and stiffness with signs of limitation of motion or other abnormal motion of the affected

joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing,

bony destruction, or ankylosis of the affected joint(s)" with, as relevant here, "[i]nvolvement of

one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to

ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.02A (Sept. 29, 2016), *available

at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0434121013. Listing 1.03, reconstructive surgery

or surgical arthrodesis of a major weight-bearing joint, requires "inability to ambulate effectively

. . . and return to effective ambulation did not occur, or is not expected to occur, within 12

months of onset." *Id.* § 1.03. The inability to ambulate effectively "means an extreme limitation

of the ability to walk," defined "generally as having insufficient lower extremity functioning . . .

to permit independent ambulation without the use of a hand-held assistive device(s) that limits

the functioning of both upper extremities." *Id.* § 1.00(B)(2)(b). District courts in this Circuit have

therefore noted that an inability to ambulate effectively "requires that a claimant need a walker,

two crutches, or two canes to assist in walking." *Polynice v. Colvin*, No. 12-cv-1381, 2013 WL

6086650, at *7, 2013 U.S. Dist. LEXIS 164188, at *20 (N.D.N.Y. Oct. 18, 2013), *report-

recommendation adopted by* 2013 WL 6086650, 2013 U.S. Dist. LEXIS 164188 (N.D.N.Y. Nov.

19, 2013); *accord Schieno v. Colvin*, No. 15-cv-335, 2016 WL 1664909, at *6, 2016 U.S. Dist.

LEXIS 55225, at *15 (N.D.N.Y. Apr. 26, 2016) ("[T]o constitute an inability to ambulate

effectively, walking must involve the use of both arms, such as with a pair of canes or a

walker."). Plaintiff bore the burden of establishing that her impairments meet or medically equal a listed impairment. *Boylan v. Astrue*, 32 F. Supp. 3d 238, 246 (N.D.N.Y. 2012).

Here, the Court concludes that there is substantial evidence in the ALJ's decision and in the record to support the determination that Plaintiff's impairments do not meet or medically equal Listing 1.02. As an initial matter, Plaintiff's argument that the ALJ failed to adequately explain why the requirements of Listings 1.02 and 1.03 were not met does not alone require remand. Although an ALJ "'should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment,' the absence of an express rationale for an ALJ's conclusions does not prevent [a court] from upholding them so long as [the court is] 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (summary order) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)); *Polynice*, 2013 WL 6086650, at *7 n.6, 2013 U.S. Dist. LEXIS 165159, at *19 n.6 (same). As discussed below, there is substantial evidence to support the ALJ's determination that Plaintiff can ambulate with a single cane, which precludes a finding that her impairments meet or medically equal Listings 1.02 and 1.03.[7]

The ALJ noted that Listing 1.02 requires an inability to ambulate effectively and found that Plaintiff's impairment did not meet the requirements of the listing because "there [wa]s well maintained hip joint, sensory intact, and normal muscle strength." (R. 17). Elsewhere in the opinion, the ALJ noted Plaintiff's "use of a cane for ambulation" and her "ability to ambulate

---

[7] The ALJ did not specifically discuss Listing 1.03 in his decision. However, because Listing 1.03, like Listing 1.02, requires an inability to ambulate effectively, any error in failing to explicitly discuss Listing 1.03 was harmless. *See Gabriel C. v. Comm'r of Soc. Sec.*, No. 18-cv-671, 2019 WL 4466983, at *9, 2019 U.S. Dist. LEXIS 158841, at *28–30 (N.D.N.Y. Sept. 18, 2019) (finding that any error in the ALJ's failure to explicitly discuss two particular listings was harmless because those listings had requirements in common with listings the ALJ did discuss, and collecting cases).

with a cane or walker." (R. 19–20). Substantial evidence in the record supports the determination

that Plaintiff can ambulate with a cane. (*E.g.*, R. 378–79 (Plaintiff presenting to March 5, 2019

consultative examination with a cane, which Dr. Lorensen opined was "medically necessary at

the current time"), 544, (March 15, 2019 treatment noted indicating that Plaintiff was "still using

a cane to get around"), 539 (April 23, 2019 treatment note indicating that Dr. Greenky "want[ed]

her to go back on the cane temporarily"), 630 (April 30, 2019 treatment note indicating that

Plaintiff was told to use the cane "as needed"), 535 (May 24, 2019 treatment note indicating that

Plaintiff was "using a cane to get around")). Moreover, Plaintiff arrived at the assessment

conducted by DPT Johnson using a "straight cane," and she was "able to complete

lifting/carrying without device." (R. 755; *see also* R. 756 (DPT Johnson indicating that Plaintiff

can ambulate 40 feet without a cane and that use of a cane is not medically necessary)). To be

sure, there are a limited number of instances in the record indicating that Plaintiff used a walker.

(*E.g.*, R. 320, 366, 532, 711). However, most of these instances occurred shortly after her hip

surgery before Plaintiff reverted to using a cane again. (R. 320 (February 5, 2019), 366 (February

7, 2019), 532 (May 29, 2019 (requesting a prescription for a walker "so she can acquire

temporary disability"))). There is also no indication in the record that a walker was or would be

medically necessary for at least twelve months. *Cf. Kathy E. v. Berryhill*, No. 17-cv-871, 2018

WL 4033753, at *4, 2018 U.S. Dist. LEXIS 143377, at *11 (N.D.N.Y. Aug. 23, 2018) ("The

medical records indicate that Plaintiff used a walker only while recovering from surgery and that

since that time she has only used a single cane to walk."). Because substantial evidence supports

the finding that Plaintiff can ambulate with a cane, she cannot establish an inability to ambulate

effectively. *Schieno*, 2016 WL 1664909, at *6, 2016 U.S. Dist. LEXIS 55225, at *15–16 (finding

that "the evidence does not establish limitations" that meet a musculoskeletal listing where the

plaintiff used "only one cane").[8] Substantial evidence therefore supports the determination that her impairments do not meet or medically equal a listed impairment.

### 2.      Weighing of the Opinion Evidence

Plaintiff next argues that the ALJ "failed to weigh the opinions" of Dr. Greenky and DPT Johnson pursuant to the appropriate regulations and that the ALJ "did not rely upon a medical opinion to support the RFC finding." (Dkt. No. 17, at 19–23). Defendant generally responds that the ALJ properly considered Dr. Greenky's and DPT Johnson's opinion and that there was no gap in the record that the ALJ was required to fill. (Dkt. No. 18, at 10–11, 14–17).

In accordance with regulations which apply to claims filed on or after March 27, 2017, the Commissioner must consider medical opinions and "evaluate the[ir] persuasiveness" based on the following five factors: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 404.1520c(a)–(c). The ALJ is required to "articulate how [he] considered the medical opinions" and "how persuasive [he] find[s] all of the medical opinions." *Id*. § 404.1520c(a), (b). The two "most important factors" for determining the persuasiveness of medical opinions are consistency and supportability, and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion. *Id*. § 404.1520c(b)(2). With respect to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). The regulations provide that, with respect to "consistency," "[t]he more

---

[8] Plaintiff argues that the ALJ did not address DPT Johnson's opinions that Plaintiff could not "perform activities like shopping" or "walk a block at a reasonable pace on rough or uneven surfaces." (*See* R. 760). While these are two examples of ineffective ambulation, *see* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.00(B)(2)(b), as discussed above, the inability to ambulate effectively is defined as involving the use of both arms.

consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). An ALJ must consider, but is not required to discuss, the three remaining factors when determining the persuasiveness of a medical source's opinion. *Id.* § 404.1520c(b)(2).

An ALJ's failure to explain the supportability and consistency of the medical opinions in the record is procedural error. *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019); *see also Loucks v. Kijakazi*, No. 21-cv-1749, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *3 (2d. Cir. June 17, 2022) (finding that "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record"). However, "if 'a searching review of the record assures [the court] that the substance of the [regulation] was not traversed,'" the court may affirm the Commissioner's decision. *Loucks*, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *4 (quoting *Estrella*, 925 F.3d at 96).

Here, Plaintiff argues that the ALJ failed to properly weigh the opinion of DPT Johnson because the ALJ did "not apply the consistency or supportability factors to the opinion," and the ALJ's analysis was "too conclusory." (Dkt. No. 17, at 20–22). Defendant responds that the ALJ's decision, "read as a whole," provides support for his evaluation of DPT Johnson's opinion and his determination that the opinion was inconsistent with other evidence in the record. (Dkt. No. 18, at 14–17).

The ALJ found DPT Johnson's opinion that Plaintiff "can sit up to 25 minutes, stand 10 minutes, and six minutes walking at one time; sit a total of two hours, and stand/walk one hour total; requires a cane to ambulate; occasionally climbing stairs and ramps, balance, and kneel, and never stoop, crouch or crawl; lift/carry up to 20 pounds occasionally" to be "not persuasive."

(R. 19–20). The ALJ explained that "a physical therapist is not an acceptable medical source" and that DPT Johnson's conclusions "are not consistent with the overall medical evidence reflecting less severe restrictions." (R. 20). The ALJ does not provide any further explanation of his consideration of DPT Johnson's opinion.

Defendant does not argue that DPT Johnson, even if not an "acceptable medical source," is not a "medical source" capable of rendering a "medical opinion" which must be considered pursuant to the regulations. *See* 20 C.F.R. §§ 404.1520c(b) (governing consideration of "medical opinions"), 404.1502 (defining "Acceptable medical source" and "Medical source"), 404.1513 (defining "medical opinion" as a "statement from a medical source . . ."); *see also Matthew J. S. v. Comm'r of Soc. Sec.*, No. 20-cv-1606, 2022 WL 957974, at *3, 2022 U.S. Dist. LEXIS 58895, at *10 (Mar. 30, 2022) (noting that a physical therapist's opinion is a medical opinion (citations omitted)). Thus, the ALJ committed procedural error by failing to explain how he considered the supportability and consistency of DPT Johnson's opinion. First, nowhere does the ALJ discuss the "objective medical evidence and supporting explanations" DPT Johnson provided to support his opinions, and the ALJ therefore failed to apply or consider the supportability factor. *See Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-cv-502, 2021 WL 363682, at *14, 2021 U.S. Dist. LEXIS 19212, at *44–45 (S.D.N.Y. Jan. 29, 2021) (finding that the ALJ "failed to apply or even consider the supportability factor" where the ALJ did not explain what the respective providers "used to support their opinions and reach their ultimate conclusions"), *report-recommendation adopted by* 2022 WL 717612, 2022 U.S. Dist. LEXIS 42979 (S.D.N.Y. Mar. 10, 2022). Second, the ALJ's conclusory statement that DPT Johnson's conclusions "are not consistent with the overall medical evidence" is not an adequate articulation of the consistency factor. *Ricky L. v. Comm'r of Soc. Sec.*, No. 20-cv-7102, 2022 WL 2306965, at *3, 2022 U.S. Dist. LEXIS 113151,

at *9 (W.D.N.Y. June 27, 2022) (noting that an ALJ who "merely states" that an opinion is "not consistent" with the overall evidence has "failed to adequately explain his conclusions regarding the consistency factor" (citation omitted)); *see also Loucks*, 2022 WL 2189293, at *2, 2022 U.S. App. LEXIS 16829, at *3–4 (finding procedural error where the ALJ did not explain "how the opinion was consistent with the record, except to conclude that it was"); *Lisa T. v. Kijakazi*, No. 20-cv-1764, 2022 WL 2207613, at *6, 2022 U.S. Dist. LEXIS 109225, at *18–19 (D. Conn. June 21, 2022) (holding that the ALJ's "wholly conclusory" supportability and consistency findings "did not follow the articulation requirements" of the regulations and collecting cases).

Having conducted a searching review of the record, the Court also finds that the substance of the regulations was traversed and the ALJ's procedural error was not harmless. First, there is nothing in the ALJ's decision from which the Court can glean his consideration of the supportability of DPT Johnson's opinion. *See Ricky L.*, 2022 WL 2306965, at *4, 2022 U.S. Dist. LEXIS 113151, at *11–12 (noting that an ALJ's procedural error may be harmless where the Court can "adequately 'glean' how the ALJ weighed the consistency and supportability factors" (citations omitted)). DPT Johnson's medical source statement contained written explanations. (*See* R. 755–60). For example, in explaining his opinions as to Plaintiff's ability to sit, stand, and walk, DPT Johnson wrote that Plaintiff "will likely need time to lay down during day due to pain." (R. 756). The statement was also largely based on, and expressly incorporated, the functional capacity evaluation that DPT Johnson performed of Plaintiff. (*See* R. 718–54). DPT Johnson's detailed, thirty-seven-page report contains the results of numerous tests of Plaintiff's capabilities. (*Id.*). Other than a block citation to the exhibit containing this report, the ALJ does not mention or discuss any of the testing or other evidence on which DPT Johnson based his opinion. (R. 19–20).

Second, the Court likewise cannot glean from the ALJ's decision his consideration of the consistency of DPT Johnson's opinion with other evidence in the record. While Defendant argues that the ALJ "discussed evidence from the record that was inconsistent" with DPT Johnson's opinion, (Dkt. No. 18, at 15), the ALJ discusses and cites only a handful of pages in the record. (R. 19 (citing R. 322, 532, 544, 705, 709)). It is true that these treatment notes show that Plaintiff occasionally showed normal gait, normal sensory and motor exams, negative straight leg tests, and normal muscle strength. (*See id.*). However, the ALJ did not discuss or reconcile the record evidence indicating that Plaintiff consistently complained of persistent hip and thigh pain after her surgery, (*e.g.*, R. 458–60, 539, 541, 697), had a limp or otherwise abnormal gait, (*e.g.*, R. 379, 697), tenderness over her right hip, (*e.g.*, R. 461, 464, 588, 632–33, 662–80), and had multiple emergency room visits complaining of hip pain (*e.g.*, R. 393, 403, 412, 616). Given the ALJ's sparse discussion of and citations to the record, and his failure to grapple with contradictory evidence in the record, the Court cannot conclude that the substance of the regulation requiring him to evaluate the consistency of DPT Johnson's opinion was not traversed. *Cf. Lisa T.*, 2022 WL 2207613, at *8, 2022 U.S. Dist. LEXIS 109225, at *23–24 ("It may be the case that there are articulable reasons why the ALJ did not find [the] opinion persuasive. But without a more fulsome explanation . . . , the Court is not in a position to review whether the ALJ's conclusions are supported by substantial evidence." (internal citation omitted)).

Nor can the Court conclude that the ALJ's error was otherwise harmless. DPT Johnson opined, inter alia, that Plaintiff was able to sit for a total of two hours in an eight-hour workday. (R. 756). He noted that Plaintiff "will likely need time to lay down during day due to pain." (*Id.*). As detailed in his evaluation report, Plaintiff "appeared uncomfortable" when she sat

"continuously for 25 minutes" during the intake process. (R. 724). She was observed "guarding, bracing, grimacing, static weight shifting, moaning/groaning, rubbing and/or massaging." (*Id.*). In addition to the objective test results, the report also generally states that Plaintiff appeared uncomfortable during the examination, regularly reporting hip pain. (*Id.*). The vocational expert testified that a hypothetical individual limited to "a total workday of two hours sitting, and two hours standing and walking" who would "need to change position at will" would be "excluded from all competitive employment." (R. 53). Thus, had the ALJ credited DPT Johnson's opinion, it is possible that Plaintiff would have been found disabled. *See, e.g.*, *Lisa T.*, 2022 WL 2207613, at *8–9, 2022 U.S. Dist. LEXIS 109225, at *24–26 (remanding where the record did not compel "only the conclusion drawn by the ALJ" and where there was a possibility that the ALJ's legal error "impermissibly tainted the ALJ's subsequent RFC determination"); *Maria S. v. Comm'r of Soc. Sec.*, No. 21-cv-544, 2022 WL 3017373, at *8, 2022 U.S. Dist. LEXIS 134751, at *25 (N.D.N.Y. July 29, 2022) (remanding where the ALJ failed to apply the correct legal standards because "the Court cannot say that such errors were harmless as the little or no persuasiveness given to the[] medical opinions almost certainly affected the RFC determination").

In sum, the Court finds that the ALJ did not properly apply the regulations to his consideration of DPT Johnson's opinion and that the ALJ's legal error was not harmless. The Court therefore remands for the ALJ to properly apply the regulations to the consideration of DPT Johnson's opinion and provide adequate explanations. Because remand is required, the Court does not address Plaintiff's remaining arguments.

## IV.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED**, and this action is

**REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further

proceedings consistent with this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>August 15, 2022</u>
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge